IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 26, 2013 Session

**STATE OF TENNESSEE v. JACK PRICE and
LARRY THOMAS COCHRAN**

**Appeal from the Circuit Court for Sevier County
No. CR14970-II, 14906, 14956, 15358     Richard R. Vance, Judge**

---

**No. E2011-01050-CCA-R3-CD - Filed September 26, 2013**

---

Following a jury trial, the Defendants, Jack Price and Larry Thomas Cochran, were convicted of attempted first degree premeditated murder, a Class A felony; aggravated assault, a Class C felony; and two counts of attempted aggravated robbery, a Class C felony.  Defendant Cochran was also convicted of resisting arrest and criminal impersonation, Class B misdemeanors.  Both Defendants were sentenced to an effective twenty-five years' incarceration for their respective convictions.  In this appeal as of right, the Defendants raise the following issues: (1) both Defendants argue that the evidence was insufficient to support a finding by the jury of premeditation; (2) Defendant Cochran argues that issuance of a criminal responsibility instruction was in error; (3) Defendant Cochran contends that admission of his co-defendant's statements against him violated Bruton v. United States, 391 U.S. 123 (1968); and (4) both Defendants contend that the trial court erred by submitting enhancement factors to the jury and by allowing the prosecutor to charge those factors, and that their sentences were excessive.  Following our review, we affirm the Defendants' convictions but, because the trial court utilized an unauthorized sentencing procedure, remand the case to the trial court for resentencing in accordance with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court
Affirmed in Part and Reversed in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Bryce W. McKenzie (on appeal), and Andrew E. Farmer (at trial), Sevierville, Tennessee, for the appellant, Jack Price.

Timothy J. Gudmundson (at trial and on appeal), Sevierville, Tennessee, for the appellant, Larry Thomas Cochran.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; James B. ("Jimmy") Dunn, District Attorney General; and Steven R. Hawkins and Ashley D. McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises out of a November 16, 2009 armed robbery that took place at the Greystone Lodge in Gatlinburg. Subsequently, the Defendants were both indicted for the attempted first degree premeditated murder of Kevin Brown, the aggravated assault of Kevin Brown, and two counts of attempted aggravated robbery, one for Kevin Brown and the other for Winston Cartwright (the victims). See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-202, -13-402. Defendant Cochran was also indicted for resisting arrest and criminal impersonation. See Tenn. Code Ann. §§ 39-16-301, -602. A joint, two-day trial was held on December 9 and 10, 2010.

The evidence adduced at trial revealed the following facts. On November 16, 2009, Winston Cartwright and Kevin Brown were staying in a motel room at the Greystone Lodge. On that date, Mr. Brown's five-year-old nephew was also there visiting. Defendant Price called Mr. Brown that evening and asked if he could come over to the motel room and play with Mr. Brown's new X-box gaming system. Mr. Brown testified that, about six months prior, he had told Defendant Price that he had purchased a "brand new X-Box 360, Batman edition." Mr. Brown also said that the gaming system cost him "over four hundred bucks[.]"

Mr. Cartwright, on the evening of November 16, left to go visit his mother at a nearby motel. On his return walk back to the Greystone Lodge, he saw a gold Buick pull into the motel's parking lot. It was dark outside at the time. According to Mr. Cartwright, when he got about halfway up the stairwell to his room, someone put a gun to the back of his head and threatened, "if you move, if you say anything, I'll kill you." Cartwright said that he recognized the voice as belonging to Defendant Price. Cartwright was forced up the stairs to the room, where he knocked on the door. Once inside the room, Defendant Price pushed Mr. Cartwright to the floor.

As he entered, Defendant Price said, "[G]ive me everything you've got[,]" and he then went directly to Mr. Brown and hit him in the head with the 9mm pistol. Mr. Brown grabbed a knife off the table and said, "[D]o you want to f--king f--k." As Mr. Brown stood up to swing at Defendant Price, Defendant Price pointed the weapon at Mr. Brown's face and pulled the trigger. However, rather than firing, the clip fell out of the weapon. Defendant Price then "threw his hands up" in the air, and Mr. Brown proceeded to swing at Defendant Price with the knife.

Mr. Brown testified that he also saw Defendant Cochran, who was Defendant Price's cousin and also known to him as "Ghost," inside the motel room.[1] According to Mr. Brown, Defendant Cochran was behind Defendant Price and was pointing his gun at Mr. Cartwright on the floor. After the clip fell out, Defendant Price proceeded to back out the door, and Defendant Cochran was "right behind him." Mr. Brown saw Defendant Cochran point the gun at him as he was leaving the room, "like he was going to fire[.]" Mr. Cartwright said that he heard Defendant Cochran saying "go, go, go, go."[2] Mr. Brown slammed the door shut with his foot and dropped to the floor. Mr. Brown then went to check on his nephew. After a couple of seconds had passed, Mr. Brown went outside and saw "a gold Buick driving off in a hurry with a guy that ran and jumped in the window head first and his legs were hanging out the window." According to the victims, the whole incident happened very fast.

After the robbers left, they called the police. According to Mr. Brown, he then received a text message from Defendant Price asking "why [he had] got the police into it[.]" Mr. Brown responded by text message "because you tried robbing my house, that's why." Officer Matt Smith of the Gatlinburg Police Department arrived on the scene where he spoke with Mr. Cartwright and Mr. Brown. Officer Smith described the two men as "[v]ery erratic, scared, excited, just a variation of emotions."

Mr. Cartwright and Mr. Brown thereafter gave several statements to the police. Mr. Brown was shown some photo arrays, and he was able to identify Defendant Price therefrom but not Defendant Cochran. Mr. Brown elaborated at trial that Defendant Price had tattooed on his hands "Family First" in italics. According to Mr. Brown, he saw this tattoo when Defendant Price pulled the trigger. Also at trial, Mr. Brown identified the weapons used by each Defendant during the robbery, a 9mm by Defendant Price and .25 caliber handgun by Defendant Cochran, and the Lorcin 9mm clip, which contained six bullets, left inside the motel room. Mr. Cartwright was able to identify the 9mm held by Defendant Price and the clip that fell out the pistol. Both victims were able to identify a photo of the gold Buick, which showed a Delaware license plate, as the same one they saw at the motel that day. Mr. Cartwright opined at trial that this was "all over" the "X-box and tattoo equipment."

The following day, Officer Todd Myers and Detective Keith Brackins of the Gatlinburg Police Department went to a residence on Ellis Ogle Road to serve a warrant on Defendant Price; Officer Shane Carl Bowen, also employed by the Gatlinburg Police

---

[1] Mr. Brown testified that there were a total of three men who came to the motel room to rob him. He was never able to identify the third individual.

[2] Mr. Cartwright was cross-examined extensively about whether he saw or only heard the events taking place in the motel room and about whether his identifications of the Defendants were based upon sight or sound.

Department, was assisting in serving the warrant. When Officer Bowen arrived at the house, he "heard a loud thud and gave chase to a subject." The subject fled into the woods. After a K-9 unit arrived, the dog tracked the subject's scent through the woods and located Defendant Cochran. A struggle ensued, and Defendant Cochran was arrested.

When asked to identify himself, Defendant Cochran initially provided an incorrect name and social security number, giving his phone number as his social security number. Officer Bowen testified that others had given phone numbers as social security numbers and that such practice was always out of deceit. Defendant Cochran was initially taken to the Gatlinburg Police Department and then on to the hospital to receive treatment for his injuries from running through the woods.

While at that residence, Officer Myers impounded a 1997 Buick, which matched the description given by Mr. Cartwright and Mr. Brown. Defendant Price was not at the residence when the officers attempted to serve the warrant on him, but he later turned himself in.

Terry Pack lived at the Ellis Ogle Road residence and testified that Defendant Price began living with him after getting "kicked out of his other house[.]" According to Mr. Pack, his parents were out of town at the time of the incident. Mr. Pack said that Defendant Price drove a Buick and identified the previously introduced photograph of the Buick with Delaware plates. Mr. Pack also testified that Defendant Price was from Delaware.

Mr. Pack only knew Defendant Cochran through Defendant Price. According to Mr. Pack, Defendant Cochran was in town from Delaware trying to get his brother, also Defendant Price's cousin, out of jail, but the Defendants were unable to obtain the money to do so. Prior to the day of the attempted robbery, Defendant Price had asked Mr. Pack if they had any guns in the house, but Mr. Pack told him that they did not. Mr. Pack became suspicious when Defendant Price asked about the guns and had also asked for money, so Mr. Pack told Defendant Price that if "he was going to do something they had to leave."

On November 16, Defendant Price left Mr. Pack's house in a maroon four-door sedan with someone who went by the name of "Tay." When Defendant Price returned alone later that evening, "he was real nervous and he seemed really upset, like he was really angry and he was sweating a lot." When Mr. Pack inquired as to the cause, Defendant Price relayed details about the robbery to him. Defendant Price told Mr. Pack that they went to the Greystone Lodge that night and met Gage Nero, asking him for "any weed." They walked up to the room to retrieve the drugs, and Defendant Price "put Gage on the floor and told him not to move." According to Defendant Price, there were several other people in the room when they entered, including a girl and an infant. Defendant Price said that, after entering

-4-

the motel room, he "looked around" and "put" the 9mm to Mr. Brown's head, who grabbed a knife and started swinging. Defendant Price said that, when he pulled the trigger in response, nothing happened and that the clip fell out, so they ran out. After telling Mr. Pack this story, Defendant Price stayed at Mr. Pack's house that night; when Mr. Pack awoke the next day, Defendant Price was gone. Later during Mr. Pack's trial testimony, he testified that Defendant Price placed Defendant Cochran inside the victims' motel room and stated that Defendant Cochran participated in the attempted robbery by "reaching for stuff on the table." Mr. Pack speculated that Defendant Cochran was reaching for drugs.

Mr. Pack also described the officers' arrival at his house on November 17 to serve the warrant on Defendant Price. According to Mr. Pack, Det. Brackins knocked on the door and asked if Defendant Price was there. Mr. Pack let Det. Brackins inside to look, and then he heard someone jump out of his parents' bedroom window. Following these events, Mr. Pack was taken to the station for an interview. When he returned home, accompanied by the police, the front door was "wide open" and Defendant Price's clothes were on the couch. Mr. Pack's parents' bedroom door was open, and he and the officer saw the 9 mm in the lockbox in the room. There was not a clip with the gun. He did not remember seeing any other weapons in the house that day. He identified the 9mm weapon introduced at trial and stated that it belonged to his father; he also testified that the clip introduced at trial was the one "that goes in the nine millimeter." He further identified the .25 caliber pistol as belonging to his mother.

Captain Jeff Fisher of the Gatlinburg Police Department testified that he went to the residence on Ellis Ogle Road on November 17, where Mr. Pack lived, to "check to see if a weapon was there that was possibly involved in the case." Mr. Pack showed Captain Fisher three weapons, including a 9mm semi-automatic and a .25 caliber pistol. Captain Fisher took only the 9mm at that time to see if the victims could possibly identify it and left the other two guns at the house. Captain Fisher testified that the gun confiscated was the only Lorcin 9mm he had ever seen. The .25 caliber weapon introduced at trial appeared to be, in Captain Fisher's opinion, the same weapon he saw but did not take from Mr. Pack's house that day.

Detective Rodney Burns of the Gatlinburg Police Department showed the 9mm taken from Mr. Pack's residence to the victims, who identified it as the one used in the robbery. Det. Burns interviewed Defendant Price after he turned himself in, and Defendant Price told Det. Burns that "he acted alone in it" and "that the gun he used he had hid on the river bank." In April of the following year, a confidential informant told Det. Burns "that Ashley Davis had that gun that was used in the home invasion and robbery that occurred at the Greystone." After searching Ashley Davis's bedroom, Det. Burns found a .25 caliber semi-automatic pistol, and there was a clip with live rounds in the recovered gun.

-5-

Ashley Davis testified that she was Defendant Price's ex-girlfriend and that Defendant Price gave her a gun and told her to hold on to it because he was turning himself in. Ms. Davis said that Defendant Price told her that "[h]e pulled the trigger and the clip fell out." Ms. Davis testified that she hid the gun down by the river but then returned to retrieve it when she heard that people knew where it was. She later kept the gun in her bedroom, where it was found by Det. Burns.

No identifiable prints were found on either of the pistols or the clip in the motel room. Both Defendants declined to testify and did not put on any additional proof.

The jury found the Defendants guilty as charged. After the verdicts were announced, the trial court submitted the issue of the applicable enhancing factors to the jury for their determination. The trial court allowed the prosecutor to state for the jury the factors she was seeking. At the subsequent sentencing hearing, the trial court sentenced both Defendants, as Range I, standard offenders, to concurrent terms of twenty-five years for the attempted first degree murder conviction, six years for the aggravated assault, and six years for each attempted aggravated robbery conviction. Defendant Cochran received a six-month term for both of his misdemeanor convictions, which were also to be served concurrently with his other sentences. Timely motions for a new trial were filed by both Defendants and, thereafter, denied. This appeal followed.

## ANALYSIS

On appeal, the Defendants raise the following issues: (1) whether the evidence was sufficient to support the jury's finding of premeditation; (2) whether the issuance of a criminal responsibility instruction in Defendant Cochran's case was in error; (3) whether admission of Defendant Price's statements against Defendant Cochran violated his confrontation rights pursuant to Bruton v. United States, 391 U.S. 123 (1968); and (4) whether the trial court erred by submitting enhancement factors to the jury, charged by the prosecutor, and whether their respective sentences were excessive.[3] We will address each issue in turn.

### I. Sufficiency of the Evidence

Both Defendants have challenged the sufficiency of the evidence supporting their respective convictions for attempted first degree premeditated murder. An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any

---

[3] For the purposes of clarity and brevity, we have renumbered and reordered the issues as stated by the Defendants in their briefs.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, the jury convicted the Defendants as charged of the attempted first degree premeditated murder of the victim Kevin Brown. First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d). Criminal attempt is defined at Tennessee Code Annotated section 39-12-101:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101(a), (b).

*A. Premeditation*

Both Defendants argue that there was insufficient evidence for a rational jury to determine that the attempted murder of the victim Kevin Brown was premeditated. They submit that all of the evidence showed that Defendant Price's pulling of the trigger was in response to Mr. Brown's swinging a knife toward him and that no evidence showed premeditation on the part of either Defendant.

The State responds that sufficient evidence was presented for a rational trier of fact to find the Defendants guilty of attempted first degree premeditated murder. According to the State, the use of a deadly weapon upon an unarmed victim and evidence of the procurement of a weapon support an inference of premeditation.

The Defendants reply that Mr. Brown was armed at the time of the offense, despite the State's contention that he was not. Furthermore, evidence of Mr. Brown's swinging a knife does not show premeditation but instead shows Defendant Price had no plan to kill him.

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to,

-8-

the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See Davidson, 121 S.W.3d at 614; Bland, 958 S.W.2d at 660. Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

First, the Defendants contend that there is insufficient evidence of premeditation in this case, citing to State v. James M. Coggins, Jr., No. 01C01-9310-CR-00360, 1994 WL 390445 (Tenn. Crim. App. July 28, 1994), in support of their proposition. In Coggins, the defendant accosted the victim with a knife as she got into her car, telling her, "Move over, don't say a word or I'll cut you." The victim looked at him, he repeated the command, and she then jumped up and pushed him. A struggle ensued, and the defendant, in an attempt "to stuff" the victim back into her car, stabbed her repeatedly in the breast, chest, back, throat, and arm. Two passersbys joined in the fray upon hearing the victim's screams. Ultimately, the defendant stabbed one passerby in the side and the chest and cut the other passerby in the leg. The defendant was charged with three counts of attempted first degree murder, one count for the victim and one count for each passerby. This court held that, under those circumstances, there was not sufficient proof of premeditation and deliberation regarding all three counts of attempted first degree murder and modified the judgments to reflect three convictions for attempted second degree murder. Coggins, 1994 WL 390445, at *3-5. In so holding, the court reasoned as follows:

> The record reflects that the attack against [the victim] occurred immediately after she resisted [the defendant's] attempt to force her in [the] car and began to struggle with him. The attack on [the first passerby] occurred simultaneously with the assault on [the victim] when [the second passerby] surprised the defendant from behind. Finally, the defendant's actions toward [the second passerby,] swinging at his leg with a knife after [the second passerby] started to release him[,] indicated an attempt to evade apprehension.

Id. at *4.

However, we do not find the Defendants' citation to Coggins to be persuasive. What the Defendants fail to acknowledge is that Coggins was decided under a prior murder statute and based upon case law that has been superseded. The Coggins court relied on the precedent of State v. Brown, in which our supreme court held that the element of deliberation requires "time to reflect." See 836 S.W.2d 530, 540 (Tenn. 1992). The Brown court recognized that, where the intent to kill is formed during a deadly struggle, the proof would

support only a conviction for second degree murder unless the State could show that the premeditation and deliberation preceded the struggle. Id. at 542 (citing Rader v. State, 73 Tenn. 610 (5 Lea), 619-20 (Tenn. 1880)). However, the murder statute in effect at the time of the killing in Brown included elements of both premeditation, which our supreme court recognized may "arise instantaneously," and deliberation, which the court determined, "cannot be formed in an instant." Id. at 542-43. In order to avoid confusion, and to ensure that juries considered both elements, the Brown court concluded that it would be prudent to abandon the jury instruction that "premeditation may be formed in an instant." Id. at 543. The court explained,

> It is consistent with the murder statute and with case law in Tennessee to instruct the jury in a first-degree murder case that no specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan, but we conclude that it is prudent to abandon an instruction that tells the jury that "premeditation may be formed in an instant." Such an instruction can only result in confusion, given the fact that the jury must also be charged on the law of deliberation. If it was not clear from the opinions emanating from this Court within the last half-century, it is now abundantly clear that the deliberation necessary to establish first-degree murder cannot be formed in an instant.

Id. (emphasis in original). The Defendants in the instant case were charged under the statute currently in effect in Tennessee, which no longer includes the element of deliberation. See Tenn. Code Ann. § 39-13-202(a)(1) (amended in 1995 to no longer include the element of deliberation). Thus, the State was only obligated to prove the element of premeditation beyond a reasonable doubt.

Turning to an analysis of the evidence presented to the jury in this case, several of the above-listed factors support a finding of premeditation. The proof showed that the Defendants desired to procure bail money to get a family member out of jail, so, knowing that Mr. Brown had recently acquired an X-Box gaming system worth several hundred dollars, they devised a plan to rob him. Not having weapons of their own, Defendant Price took two handguns, along with ammunition, from Mr. Pack's house. That evening, the Defendants went to the victims' motel room armed to execute their plan. As Mr. Cartwright was walking up the stairs toward the room, Defendant Price put a gun to the back of his head and said, "[I]f you move, if you say anything, I'll kill you." Once inside the room, Mr. Cartwright was forced to the floor, and Defendant Price hit Mr. Brown in the head with his 9mm pistol, demanding Mr. Brown's belongings. The fact that a fight ensued upon the Defendants' arrival does not discount the existence of premeditation. When Defendant Price pulled the trigger, the weapon was pointed at Mr. Brown's head. Following the attempted

-10-

robbery, Defendant Price gave one of the handguns to his girlfriend to hold because he was going to turn himself into the authorities, and she initially hid the weapon by a river bank. There was evidence of planning; the Defendants procured deadly weapons for use during the robbery; Defendant Price made a declaration of his intent to kill; and after the attempted shooting, Defendant Price secreted evidence—all factors which support a finding of premeditation. Accordingly, we conclude that the evidence is sufficient to establish premeditation and to sustain the Defendants' convictions for attempted premeditated first degree murder.

### B. Criminal Responsibility

Defendant Cochran contends that "[t]he trial court erred in charging the jury that [he] could be guilty of attempted first degree murder, for the criminal acts of another." The State responds that the trial court properly charged the jury on criminal responsibility because Cochran was also present with a gun, acting in concert with Price.

While Defendant Cochran couches his argument in terms of an error in the jury charge, his argument is that "[t]here was no proof that [he] participated in the planning of the robbery or that he knew that [Defendant] Price intended to murder anyone. . . . The evidence is simply insufficient to provide criminal responsibility on [his] part" for attempted first degree murder. He continues,

> The trial court, in allowing the jury's verdict to stand, essentially imputes intent to [Defendant Cochran] for [Defendant] Price's trigger-pull, which premeditation could only have been formed in an instant, due to the frantic nature of the situation. Impliedly, [Defendant Cochran] was apparently convicted of attempted felony murder, an offense which does not exist under Tennessee law. See State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996).

Defendant Cochran then engages in an extensive argument why one cannot be guilty of attempted felony murder.

The jury charge given in this case does not include a felony murder charge, and the charge on criminal responsibility substantially tracked the language of the pattern instruction. See T.P.I. — Crim. 3.01. Moreover, the criminal responsibility charge does include language instructing on the "natural and probable consequences rule," providing,

> A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original

-11-

offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.[4]

While we agree with Defendant Cochran that one cannot be guilty of attempted felony murder based on well-established precedent, we discern that Defendant Cochran's actual jury instruction argument is not that the actual criminal responsibility instruction given was in error but merely that one should not have been given, at least with regard to the murder count, as it was not fairly raised by the evidence. This is clear from the Defendant's reply brief, in which he argues, "Even if the trial court properly charged the jury on criminal responsibility, the evidence adduced at trial shows the jury was wrong to apply it here, and the court should not have given this issue to the jury for their consideration." Also, in the sufficiency section of his brief, he cites to State v. Aubrey Tremaine Eisom and Cedric Moses, No. W2009-02098-CCA-R3-CD, 2010 WL 4540069, at *17 (Tenn. Crim. App. Nov. 5, 2010) ("There was no proof . . . that Mr. Moses participated in the planning of the robbery or that he knew that Mr. Eisom intended to murder the victims."), and argues,

> No proof whatsoever was presented at trial in this case that showed that [Defendant Cochran] participated with [Defendant] Price in the planning of this episode. Indeed, no proof was presented that showed that [Defendant] Price planned this episode. At best, the proof shows that [Defendant Cochran] was there at the time of the offense and that a witness was aware that [Defendant Cochran] aimed to get his cousin out of jail. There is certainly not a shred of evidence to show that [Defendant Cochran] knew that [Defendant] Price intended to murder anyone.

Accordingly, we will address whether a charge of criminal responsibility for attempted first degree premeditated murder was fairly raised by the evidence and whether the evidence was sufficient to support Defendant Cochran's conviction for attempted first degree premeditated murder based upon a theory of criminal responsibility.

As relevant here, Tennessee Code Annotated section 39-11-402 provides that a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense,

---

[4] The pattern instruction on criminal responsibility calls for inclusion of the following language when the charge includes a felony murder count: "With regard to Count _____ charging the defendant(s) with Murder in the Perpetration of _ ____, this natural and probable consequences rule does not apply. There is no requirement that the killing be foreseeable in order to hold a defendant criminally responsible, only that the defendant intended to commit the alleged _____." See T.P.I. — Crim. 3.01. This language is correctly absent from the charge in this case as no instruction on felony murder was given.

the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" See Tenn. Code Ann. § 39-11-402(2). Section 39-11-402 codified the common law, which provided for "equal criminal liability for principals, accessories before the fact, and aiders and abettors." State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000) (citing Tenn. Code Ann. §§ 39-11-401, -402, Sentencing Comm'n Cmts.). This statute does not prescribe a separate and distinct crime; instead, it works in synergy with the charged offense to establish a defendant's guilt through the actions of another. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). The justification for criminal liability is that aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion. Howard, 30 S.W.3d at 276; Key v. State, 563 S.W.2d 184, 186 (Tenn. 1978); State v. Grooms, 653 S.W.2d 271, 275 (Tenn. Crim. App. 1983).

To prove guilt through a theory of criminal responsibility the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). "Trial courts should provide a jury instruction on criminal responsibility if the issue is fairly raised by the evidence." State v. Little, 402 S.W.3d 202, 218 (Tenn. 2013) (quotation omitted). Mere presence during the commission of a crime is insufficient to support a conviction. See Flippen v. State, 365 S.W.2d 895, 899 (Tenn. 1963). It is not, however, necessary for one to take a physical part in the crime; encouragement of the principal is sufficient. State v. McBee, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). Formerly under our common law and now by statute, defendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves. See State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997). A separate indictment for criminal responsibility is unnecessary when a defendant has been indicted for the primary offense. Lemacks, 996 S.W.2d at 170; State v. Barnes, 954 S.W.2d 760, 763 (Tenn. Crim. App. 1997).

Here, Defendant Cochran was indicted for the primary offenses of attempted first degree premeditated murder, aggravated robbery, and aggravated assault. The trial court instructed the jury as to those charges, their lesser-included offenses, and criminal responsibility for the conduct of another. The proof clearly showed that Defendant Cochran was acting in concert with Defendant Price, which included the possible killing of Brown. Needing money for bail for a family member, the two men arrived armed at the motel room together. They proceeded to force their way inside the victims' motel room and attempted to steal items from the occupants therein. Testimony, albeit at times contradictory, placed Defendant Cochran inside the room with a weapon and described him as an active participant in the robbery. Mr. Brown testified that, as Defendant Cochran was exiting the motel room, he pointed his gun directly at Mr. Brown "like he was going to fire[.]" In consequence, the

-13-

evidence supported the inference that Defendant Cochran was not only present in the motel room, but that Defendant Cochran was acting with the intent to promote or assist in the aggravated robberies of Mr. Cartwright and Mr. Brown, or to benefit in the proceeds thereof, and that Defendant Cochran aided or attempted to aid Defendant Price in the commission of those aggravated robberies. The assault and attempted shooting of Mr. Brown were natural and probable consequences of their actions. Thus, the criminal responsibility issue was fairly raised, and the trial court did not err by providing an instruction on criminal responsibility for the conduct of another.

Defendant Cochran also cites to well-established case law that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). He then notes, "While the conviction here was not based on accomplice testimony, it was largely based on accomplice out-of-court statements." Defendant Price, the accomplice at issue, was a co-defendant in this case and did not testify at trial; his statements about Defendant Cochran only came in through testimony from Mr. Pack. Defendant Cochran does not cite to any case law, and we know of none, that this rule of law applies under these circumstances. Moreover, the State presented sufficient evidence at trial to corroborate Defendant Price's statements; both victims testified and identified Defendant Cochran as a participant in these crimes.[5] Defendant Cochran's sufficiency attack is essentially an argument as to the credibility of the witnesses and assertions that conflicts in the proof must be construed in his favor. Of course, this argument must fail in light of the well-established law set forth above. The evidence was sufficient for a rational jury to find Defendant Cochran guilty as a principal.

## II. *Bruton* violation

Defendant Cochran contends that the trial court erred in allowing witness Terry Pack's testimony about statements made by Defendant Price, on re-direct examination, to go to the jury over his objection. Defendant Cochran claims that admission of his co-defendant's statements violate Bruton v. United States, 391 U.S. 123 (1968), because they implicate him in the attempted robbery and murder, and he was unable to cross-examine his co-defendant. He continues, the error was prejudicial, requiring reversal, because a conviction would not have resulted had the jury not heard the statement.

The State responds that any Bruton error was unattended by a contemporaneous objection stating the specific ground of objection and, thus, is waived except for plain error. Furthermore, the State asserts that the trial court correctly allowed Mr. Pack to testify about

---

[5] Later in this opinion, we conclude that, although admission of these statements was violative of the Confrontation Clause, such error was harmless given the substantial proof of Defendant Cochran's guilt.

out-of-court statements made by Defendant Price. According to the State, the trial court did not abuse its discretion when it found that Defendant Cochran had "opened the door" to the testimony by failing to object to Defendant Price's counsel's questions on cross-examination concerning the individuals present in the motel when the attempted robbery occurred. Moreover, the State argues that, even if the trial court erred, it was harmless because there was other overwhelming evidence to convict Defendant Cochran.

Defendant Cochran replies that a Bruton objection was apparent from the context of the witness's testimony and that it was apparent from the trial court's conducting a bench conference that the court considered the objection to be Bruton-based. Defendant Cochran continues, even if no Bruton-based objection was properly lodged, there is plain error because the evidence does not overwhelmingly establish his guilt.

Here, the State did not ask Mr. Pack on direct examination about statements made by Defendant Price concerning Defendant Cochran's presence in the motel room. Defendant Price's counsel was first to cross-examine Mr. Pack and asked the following questions:

Q. Now, you also made references to there may have been some other people in that room?
A. Well, he said it was him and Tay. There was Gage, Kevin, one other girl. There was another girl, I don't know what her name is, and then there was supposedly a baby in the room.
. . . .
Q. So it's your testimony Jay told you that he was in the room and Tay was in the room and Gage and Kevin Brown and an unknown female and a child. Did you ever hear any reference to a Winston Cartwright?
A. No.

Defendant Cochran's counsel did not ask Mr. Pack any questions on cross-examination about who was present inside the motel room.

On re-direct examination, the following exchange took place between the prosecutor and Mr. Pack:

Q. What, if anything, did [Defendant] Price say about Ghost [aka Defendant Cochran]?
A. Nothing really. When I first met him I asked him who it was and he told me it was Ronnie's brother.
Q. In reference to that particular night.

-15-

A.  He had told me that Ghost was there and that he -- when they went in the room he --

The court then called the attorneys to the bench and held a bench conference:

> [DEFENDANT COCHRAN'S COUNSEL]: That's a leading question, Your Honor.
>
> [PROSECUTOR]: He's asked about who was in the house and he's made statements about there being people.  He knew from him this other person was in the house and he has a gun to them.
>
> [DEFENDANT PRICE'S COUNSEL]: That's just speculation.
>
> [PROSECUTOR]: No, the reason that's been brought out is because they brought it out in cross when he said who all was with him.
>
> THE COURT: I understand.
>
> [PROSECUTOR]: We had told him not to mention Ghost but when they brought that out, this is in relation to what they asked.
>
> THE COURT: I just wanted to make that clear, they've opened the door.
>
> [PROSECUTOR]: Yes, sir.  And that's why he didn't mention it in the first place, is because he told him not to and now he can.
>
> THE COURT: Go right ahead.  You opened it up.

Trial resumed, and the prosecutor asked Mr. Pack the following questions:

Q.  Whenever [Defendant] Price was telling you this story about who was up there and who was doing these things to these individuals, did he mention Ghost?
A. Yes, ma'am.
Q.  What did he say that Ghost did?
. . . .
A.  He was reaching for stuff on the table.

When Defendant Price's counsel recross-examined Mr. Pack, he asked the following the question, "It's fair to say that what you told me a few minutes ago is inaccurate in regards to who was in the room according to [Defendant] Price?" The trial court then sua sponte issued the following instruction:

> Ladies and gentlemen, I need to -- without a lot of explanation but for legal reasons, during the initial testimony, a rule of evidence prevented this witness from repeating what the Defendant Price said about the co-defendant. Cross-examination opened the door so that he is now permitted to talk about the other defendant. That was the rule of law that resulted in this situation, so you may consider his testimony.

The State asks on appeal that we waive review of the issue because Defendant Cochran failed to raise a contemporaneous objection, citing Tennessee Rule of Evidence 103(a)(1), which requires "a timely objection . . . , stating the specific ground of objection if the specific ground was not apparent from the context." However, on re-direct, while it appears that the trial court did so of its own accord, the trial court did address the elicited testimony from Mr. Pack about Defendant Price's statements implicating Defendant Cochran in these crimes, clearly ruling on the Bruton issue. The trial court ruled that, although the statement was previously inadmissible, the Defendants had "opened the door" to the testimony during cross-examination by Defendant Price's counsel. Because the issue was ruled upon at trial, and Defendant Cochran did raise the issue in his motion for new trial, we decline to treat Defendant Cochran's issue as waived. See Tenn. R. Evid. 103(a) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

In Bruton v. United States, 391 U.S. 123, the United States Supreme Court held that where two defendants are jointly tried, admission of one defendant's pre-trial statement implicating the co-defendant violates the co-defendant's Sixth Amendment right to confront and cross-examine witnesses against him. Id. at 136-37. "[The Bruton] rule is designed to avoid presenting evidence to the jury without affording them the opportunity to evaluate the context in which the statement was made and the veracity of its maker." State v. Zirkle, 910 S.W.2d 874, 891 (Tenn. Crim. App. 1995) (citing Douglas v. Alabama, 380 U.S. 415, 418 (1965)). The mere finding of a Bruton error, however, "does not automatically require reversal of the ensuing criminal conviction." King v. State, 989 S.W.2d 319, 329 (Tenn. 1999) (quoting Schneble v. Florida, 405 U.S. 427, 430 (1972)) (internal quotations marks omitted). When the remaining evidence of guilt is overwhelming, "and the prejudicial effect of the co[-]defendant's admission is insignificant by comparison, the Bruton error is harmless beyond a reasonable doubt." Id. at 329-30 (citing Schneble, 405 U.S. at 430).

We have no trouble concluding that Defendant Price's statement, as testified to by Mr. Pack, implicates Defendant Cochran in these crimes. In State v. Robinson, 146 S.W.3d 469 (Tenn. 2004), our supreme court analyzed the issue when confronted with a similar confrontation argument under Crawford v. Washington, 541 U.S. 36 (2004). In Robinson, the defendant complained that a police officer's testimony regarding a non-testifying witness's identification of the defendant constituted inadmissible hearsay that violated his constitutional right to confront the witnesses against him in violation of Crawford. 146 S.W.3d at 492-93. On cross-examination of the officer, defense counsel asked about the number of individuals shown a particular photospread and which of those persons identified the defendant from that spread, and the officer named two individuals. On re-direct, the officer was asked about the demeanor of one of the individuals during the identification process, and the officer testified that the witness was "very sure of himself." The defendant did not interpose an objection to the officer's testimony on re-direct examination. Our supreme court held that the defendant "both elicited and opened the door to the testimony" and could not be heard to complain on appeal about its introduction. Id. In so holding, the Robinson court cited to the well-settled principle "that a litigant 'will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct.'" Id. at 493 (quoting Norris v. Richards, 246 S.W.2d 81, 85 (Tenn. 1952)).

Several circuit courts have directly concluded that a defendant can open the door to admission of Bruton evidence otherwise barred by the Confrontation Clause. See United States v. Jimenez, 509 F.3d 682, 691 (5th Cir. 2007) (defense counsel opened the door to co-defendant's statements implicating the defendant by repeatedly asking the Drug Enforcement Administration agent to explain the basis for his suspicions about the defendant); United States v. Jernigan, 341 F.3d 1273, 1290 (11th Cir. 2003) (defendant invited Bruton error by stipulating to the admission of tape containing co-defendant's implicating statements); United States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir. 1992) ("[A] defendant who elicits a statement that may be violative of Bruton may not later claim error based on the admission of that statement."); United States v. Ramos, 861 F.2d 461, 468 (6th Cir. 1988) (defense counsel's insistence on pursuing line of questioning opened door to Bruton error; testimony about statements from a non-testifying conspirator was only allowed after defense counsel had implicated conspirator's confession and was an attempt to clarify any misconception created by defense counsel's cross-examination). It has also been said that the Confrontation Clause is a shield, not a sword. See United States v. Lopez-Medina, 596 F.3d 716, 732 (10th Cir. 2010). Thus, it is clear that a defendant may open the door to the admission of a non-testifying co-defendant's statement directly implicating that defendant in the commission of the crimes; however, that does not end our inquiry here.

The State's argument is one of invited error, i.e., that the Bruton rule is not dispositive in this case because the error was invited by Defendant Cochran's counsel by failing to object, despite the fact that it was co-defendant's counsel who elicited the testimony on cross-examination of the witness. During the course of direct examination, the witness was faithful to the admonition not to discuss the statements from Defendant Price regarding Defendant Cochran. On cross-examination, co-defendant's counsel asked Mr. Pack for specifics about the individuals present at the scene; again, in an effort to comply with the Bruton rule, Mr. Pack still did not place Defendant Cochran inside the motel room based upon Defendant Price's statements. Defendant Cochran's lawyer lodged no objection to this testimony from Mr. Pack, possibly due to the benefit Defendant Cochran received from said testimony. On re-direct, Mr. Pack finally told the jury, with the trial court's permission, that Defendant Price had also told him that Defendant Cochran was in the motel room and was attempting to steal belongings from the occupants therein.

It is true that the jury was left with a misconception following Defendant Price's counsel's cross-examination of Mr. Pack—the jury was left with a list of individuals present in the motel room that did not include Defendant Cochran. Although the State's argument has superficial appeal, "courts typically have found invited error in the Bruton context where the defendant, or his attorney, has taken an affirmative action to invite the error, such as by introducing the extrajudicial statement at trial or by stipulating to such statement's admissibility." See United States v. Macias, 387 F.3d 509, 521-22 (6th Cir. 2004) (citing Jernigan, 341 F.3d at 1290 (11th Cir. 2003). Defendant Cochran's attorney took no such affirmative action, and we will not deem this inaction to waive his confrontation rights under Bruton. This issue underscores the difficulty in pursuing joint trials for co-defendants. See State v. Gomez, 367 S.W.3d 237, 246 n.7 (Tenn. 2012) (citing United States v. White, 887 F.2d 267, 270 (D.C. Cir.1989) ("The prosecution may not gain, through the device of a joint trial, admission against one defendant of otherwise inadmissible evidence on the happenstance that the door to admitting the evidence has been opened by a co-defendant.")). We feel constrained to note that the State likewise could have prevented the misconception by objecting to the testimony. We cannot agree with the trial court that Defendant Cochran himself opened the door to the testimony in question. Thus, we conclude that the rule in Bruton was violated in this case.

Regardless, the Bruton violation was harmless beyond a reasonable doubt in light of the evidence adduced by the State during the course of the trial. As already discussed, the other evidence of Defendant Cochran's guilt is substantial, including testimony from both victims identifying Defendant Cochran as a participant in these crimes. Therefore, the trial court's failure to exclude the testimony based on a Bruton violation was harmless beyond a reasonable doubt. Defendant Cochran is without relief on this issue.

-19-

*III. Sentencing*

The Defendants challenge the imposition of the maximum sentence on each count. They argue that the trial court erred by submitting enhancement factors to the jury and by allowing the prosecutor to charge the enhancing factors to the jury with no explanation of how the factors were to be applied. Aside from the structural error, the Defendants contend that the trial court erred by applying certain enhancement factors and that their respective sentences were excessive. The State concedes that the trial court erred by submitting the enhancement factors to the jury but argues that such error was harmless because the trial court independently considered the factors that it applied to each Defendant.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulate in the record its reasons for imposing the specific sentence. See State v. Bise, 380 S.W.3d 682, 705 n.41 (Tenn. 2012).

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing. Bise, 380 S.W.3d at 708. Currently,[6] upon a challenge to the length of the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

---

[6] The Bise opinion was decided after the Defendants' initial briefs were filed in this matter.

Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.
>
> (d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d) (emphasis added).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

Following the Defendants' December 2010 trial, the trial court conducted a bifurcated sentencing hearing. After the jury returned its verdicts, the trial court permitted the

-21-

prosecutor to charge the jury with any relevant enhancement factors. The sentencing procedure utilized in this case was as follows:

THE COURT: Ladies and gentlemen, in addition to the issues of guilt and innocence, whenever a defendant has been found guilty by you, the State has sought to have certain sentence enhancing factors determined by the jury. This is a feature of our sentencing law. Even though the [c]ourt, the [j]udge, will impose the actual sentence at a later sentenc[ing] hearing, certain enhancing factors that the [c]ourt may apply have to be found to exist beyond a reasonable doubt by the jury.

So at this time, [prosecutor], do you have enhancing factors that you wish to present to this jury?

[PROSECUTOR]: We do.

THE COURT: You may proceed.

[PROSECUTOR]: Do I just give them to them?

THE COURT: You need to tell them what they are, for the record, that the State seeks.

[PROSECUTOR]: The first enhancing factor with respect to [Defendant] Price is that the defendant was a leader in the commission of the offense involving two or more criminal actors. The second is the offense involved more than one victim. The third is that the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. And the fourth is that the defendant had no hesitation about committing a crime when the risk to human life was high.

With respect to [Defendant] Cochran the defendant was a leader in the commission of an offense involving two or more criminal actors. The second is that the offense involved more than one victim. The third is that the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. And the last, the defendant had no hesitation about committing a crime when the risk to human life was high.

THE COURT: Does the State wish to put on any additional evidence or rely upon the evidence during the trial?

-22-

[PROSECUTOR]: Rely upon the evidence at trial, Your Honor.

THE COURT: [Defendant Price's counsel]?

[DEFENDANT PRICE'S COUNSEL]: Your Honor, I'm going to waive any argument at this point in time.

THE COURT: [Defendant Cochran's counsel]?

[DEFENDANT COCHRAN'S COUNSEL]: I'm going to suggest that you can't have two leaders in the conspiracy. Either [Defendant] Price was the leader or [Defendant] Cochran was the leader. I believe that the evidence at trial, which I'm relying on because it's already been established, is [Defendant] Cochran wasn't any type of leader with anything that happened. Thank you, Your Honor.

THE COURT: Let me see those factors that you're going to present.

These are the written findings forms where the jury may indicate whether or not the factors that have been enumerated exist or not, to be signed by the foreman. I'll present these to the jury.

You will rely upon your rules of evidence that the [c]ourt previously instructed you about. The State has the burden to prove the existence of these factors beyond a reasonable doubt. So would ask that the jury retire and consider these factors and we will await your verdict. Thank you.

After deliberating, the jury found that all four enhancement factors applied to Defendant Price and that three of the four, excluding the leader in the commission of the offense factor, applied to Defendant Cochran. A presentence report was ordered, and the jury was excused.

A sentencing hearing was held on April 11, 2011, where certified convictions for Defendant Cochran and the presentence reports for both Defendants were admitted into evidence, several witnesses testified, and respective counsel presented arguments. In imposing sentence on both Defendants, the trial court first noted that it had considered the facts of the offense as presented at trial, the evidence presented at the sentencing hearing, the presentence report, the statements and arguments of counsel, the relevant enhancing and mitigating factors, the principles of sentencing under the Sentencing Reform Act, and the entire record in this cause. The trial court then discussed the enhancement factors as they applied to Defendant Price:

[T]he jury found that [Defendant] Price was the leader of an offense that involved more than one actor, that is two actors[—Tennessee Code Annotated section 40-35-114(2)]. Considering all the offenses, there were more than one victim[—Tennessee Code Annotated section 40-35-114(3)]. That as to Count 1 that a firearm [was] used in the commission of the felony[—Tennessee Code Annotated section 40-35-114(9)]. Counts 2, 3 and 4 were indicted by the use of a deadly weapon, a firearm, so that factor would not apply to Counts 2, 3 and 4. The fourth factor found by the jury, that the risk to human life was high, [Tennessee Code Annotated section 40-35-114(10),] that would be inherent with any aggravated assault or attempted murder charge. But it would apply to the robbery charges based upon the facts of these offenses. The [c]ourt further considered and finds that [Defendant] Price did have a previous history o[r] course of criminal conduct, that is the illegal use of marijuana, underage consumption of alcohol and offenses reflected in his juvenile record. From all of which the [c]ourt will find that these enhancing factors would more than justify the imposition of the maximum sentence in these cases.

The trial court then considered evidence in favor of mitigation for Defendant Price but ultimately determined that the maximum sentence in the range for each offense was still appropriate.

Regarding application of enhancement factors to Defendant Cochran's sentences, the trial court similarly ruled that factor (3), the offense involved more than one victim, was appropriate; factor (9), employment of a firearm, was appropriate only with regard to the attempted murder sentence; and that factor (10), no hesitation about committing a crime when the risk to human life was high, was not appropriate as it was "inherent in these offenses, which were all violent offenses."[7] The trial court then addressed enhancement factor (1), a previous history of criminal convictions or criminal behavior:

The State presents that his previous history of criminal conduct while as a juvenile, some of which would constitute felonies if he were an adult but he has an extensive history of criminal conduct as borne out by the records filed of convictions and from the presentence investigation report. There are outstanding warrants for failure to appear and for violation of the sex offender registry. The [c]ourt makes no finding with respect to those charge[s] since at this point in time they're just charges. He's not been found guilty of those.

---

[7] We are cognizant of the fact that the trial court did apply factor (10) to Defendant Price's convictions for attempted aggravated robbery, while concluding that such was not appropriate for Defendant Cochran. Given that we are remanding this case for resentencing, we decline to address this discrepancy any further.

The court then determined, "The enhancing factors as found by the jury and as affirmed by this [c]ourt more than justify" imposition of the maximum sentence in the range for each offense. The court also considered possible mitigating evidence but ruled that they were outweighed by the applicable enhancing factors.

Turning to our analysis of the unauthorized sentencing procedure issue as presented on appeal, we must first address whether review of the issue requires us to employ the plain error doctrine. The Defendants note that they failed to object to submission of the enhancement factors to the jury, as charged by the prosecutor, either when charged or at the subsequent sentencing hearing[8] and, thus, submit that plain error relief is warranted. The State is silent on whether the Defendants have waived review of the issue and are limited to plain error review. It is true that the Defendants did not object at the time the enhancement factors were submitted to the jury or at the sentencing hearing which followed. The only objection apparent from the record appears in both Defendants' motions for new trial: "That the [j]ury was improperly instructed and tasked with finding enhancement factors against the Defendant." At Defendant Price's motion for new trial hearing, the following exchange took place.

> [DEFENSE COUNSEL]: And my last brief issue is that the [c]ourt instructed the jury on whether or not to determine -- the [c]ourt instructed the jury to determine enhancement factors. And it's our position that that is something that the trial judge should have been in charge of. . . .
>
> THE COURT: You know, at one time I thought that way, too, but the Supreme Court sort of disagreed with that and has held that -- the U.S. Supreme Court in fact has held that those sentence enhancement factors must be determined by the jury, that you have a right to a jury to make those determinations on existence of enhancing factors except for things like a person's criminal history. But the enhancement factors that were submitted to the jury for their decision were precisely what the United States Supreme Court has told us to do, so I think I'm going to follow their direction on that, at least until they tell me otherwise.
>
> [DEFENSE COUNSEL]: They have some precedence I'll say.

---

[8] Eight days prior to trial, on December 1, 2011, the State did file, in Defendant Cochran's case, a notice to seek enhanced punishment as a Range II, multiple offender and a notice of enhancement factors the State sought to introduce. The following day a notice of enhancement factors was filed against Defendant Price. Defendant Cochran's counsel at sentencing did raise an objection to the timeliness of the notice under Tennessee Code Annotated section 40-35-202.

THE COURT: They do. And our State Supreme Court has certainly adopted those.

Later on, the prosecutor argued, "[T]he [c]ourt has already addressed whether or not the jury was properly tasked with finding enhancement factors, and as the [c]ourt said this is something that has [to] be determined by a jury, and that would be what the State's position obviously would be in this case." The issue does not appear to have been discussed any further at Defendant Cochran's motion for new trial hearing.

Rule 30(b) of the Tennessee Rules of Criminal Procedure provides that failure to make an objection to the content of an instruction "does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial." Tenn. R. Crim. P. 30(b). An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection. State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005) (citing State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996)). If a jury instruction is erroneous or the trial judge fails to give a requested instruction, a defendant has two options: he can call it to the trial judge's attention immediately, or he can sit on his objection and allege it as a ground in support of his motion for a new trial. State v. Haynes, 720 S.W.2d 76 (Tenn. Crim. App. 1986). Because the Defendants are challenging an erroneous charge, Rule 30 allows the issue to be raised for the first time at the motion for new trial stage, and therefore, the Defendants have not waived review of the issue. See, e.g., State v. Joshua Eugene Anderson, No. E2005-02660-CCA-R3-CD, 2007 WL 1958641, at *11 (Tenn. Crim. App. July 6, 2007) (at the sentencing hearing for first degree murder conviction, the defendant failed to object to the supplemental instruction but did raise the issue in his motion for new trial; this court declined to apply waiver).

First, the Defendants argue that the trial court erred by allowing the prosecutor to charge the jury with the applicable enhancement factors. We agree with the Defendants. Article VI, section 9 of the Tennessee Constitution specifically directs that "[j]udges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." "It is the duty of the trial judge without request to give the jury proper instructions as to the law governing the issues raised by the nature of the proceedings and the evidence introduced during trial . . . ." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn.1990)) (internal quotation marks omitted). Moreover, Rule 30 provides for the trial court to instruct the jury, not the prosecutor. See Tenn. R. Crim. P. 30. Thus, it was error to allow the prosecutor to charge the jury with the enhancement factors.

More importantly though, we agree with the parties that there is no statutory authority for charging the enhancement factors to the jury regardless of whether the factors were charged by the prosecutor or the trial court. The criminal acts in this case occurred in November 2009; the Defendants' trial was held in December 2010; and the sentencing hearing was conducted in April 2011. Here, the trial court submitted the enhancement factors to the jury, apparently relying on the precedent established by Blakely v. Washington, wherein the United States Supreme Court held that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" 542 U.S. 296, 301 (2004) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)). The trial court in the case sub judice failed to acknowledge or address the various decisions in which our supreme court has addressed the 2005 amendments to Tennessee's sentencing provisions.

Our supreme court "has held repeatedly that the 2005 amendments resolved the Sixth Amendment constitutional concerns addressed in Blakely v. Washington that arise when trial courts rely on enhancement factors that have not been found by a jury." State v. Cross, 362 S.W.3d 512, 528 (Tenn. 2012) (citing State v. Hester, 324 S.W.3d 1, 69 (Tenn. 2010); State v. Banks, 271 S.W.3d 90, 144-45 (Tenn. 2008); State v. Carter, 254 S.W.3d 335, 342-44 (Tenn. 2007)). As aptly noted by the Cross court:

> Prior to being amended in 2005, Tennessee's sentencing laws set presumptive sentences in non-capital cases. The midpoint of the sentencing range was the presumptive sentence for all Class A felonies and the statutory minimum sentence was the presumptive sentence for all other felonies. Under the prior sentencing scheme, a trial court could not increase a defendant's sentence beyond the presumptive sentence in the absence of an enhancement factor. However, a trial court could increase the sentence to the maximum within the range if it found even a single enhancement factor.

> In response to constitutional concerns arising from the United States Supreme Court's Blakely v. Washington decision, the General Assembly amended Tennessee's sentencing statutes to remove presumptive sentences. These changes to the sentencing structure "enabled Tennessee's trial courts to sentence a defendant to any sentence within the applicable range as long as the length of the sentence is 'consistent with the purposes and principles' of the sentencing statutes." The 2005 amendments to Tennessee's sentencing laws have plainly "increase[d] the amount of discretion a trial court exercises when imposing a sentencing term." These changes also eliminated the Blakely constitutional concern with Tennessee trial courts finding the facts necessary to apply enhancement factors.

Id. at 528-29 (internal citations omitted). The sentencing issues previously aroused by Blakely v. Washington were rendered moot by the 2005 Amendments to the Sentencing Reform Act of 1989. The State concedes that there is no authority upon which the trial court might rely to conduct these types of bifurcated sentencing proceedings. We agree with the parties that the sentencing procedure employed in this case is without any basis in our statutes or case law.

Turning to the remedy, the State contends that trial court's error is harmless, arguing that "regardless of the manner in which they were presented, the record supports the trial court's application of most of the enhancement factors found by the jury; and the trial court independently considered the factors it applied." The Defendants contend that we should nullify the factors found by the jury and impose the minimum sentence in the various ranges.

In a case similar to this one, a panel of this court concluded that there was no statutory authority for conducting a bifurcated sentencing hearing but ultimately determined that the error was harmless under the facts of that case. See State v. Gary Jones, No. M2005-00674-CCA-R3-CD, 2006 WL 1868443, at *11 (Tenn. Crim. App. July 6, 2006). In so concluding, the panel reasoned as follows:

> In determining the length of [d]efendant's sentence, the trial court specifically considered the two enhancement factors found by the jury. However, the trial court also found, upon considering the principles of sentencing and the facts and circumstances of the case, that enhancement factors (2) and (9) were applicable in determining the length of [d]efendant's sentence based on [d]efendant's lengthy criminal history and his previous unsuccessful attempts to comply with the terms of his probated sentences. See T[enn]. C[ode] A[nn]. § 40-35-114(2), (9). Nonetheless, even if it was error for the trial court to consider the enhancement factors found appropriate by the jury, the two enhancement factors found applicable by the trial court, enhancement factors (2) and (9), upon consideration of the relevant sentencing principles, are sufficient to support the sentence imposed.
>
> . . . .
>
> Based on the presence of the two enhancement factors determined by the trial court to be applicable, and no mitigating factors, we conclude that the trial court did not err in sentencing [d]efendant to twelve years for his conviction of the delivery of more than 0.5 grams of cocaine. Thus, any error in conducting a bifurcated sentencing hearing was harmless error. See Tenn. R. Crim. P. 52(a).

-28-

Id.

We cannot conclude that the error is harmless in this case. First, we cannot clearly separate the factors applied by this trial court to the Defendants' sentences from those found by the jury. Although the trial court did assess the factors found by the jury and additionally considered the Defendants' respective criminal histories, the trial court still made statements like "[f]rom all of which these enhancing factors would more than justify the imposition of the maximum sentence in these cases" and "[t]he enhancing factors as found by the jury and as affirmed by this [c]ourt more than justify" imposition of the maximum sentence in the range. These comments do not assure us that the reasons articulated by the trial court at the sentencing hearing were truly independent. Accordingly, we do not believe that the trial court's sentencing findings in this case suffice or render harmless the trial court's submission of these factors to the jury.

Of more significance though, the Jones Court was not guided by the numerous cases from our supreme court in response to Blakely and the 2005 sentencing amendments or by the recent directive in Bise. As previously noted, our supreme court has repeatedly held that the 2005 amendments resolved any Sixth Amendment concerns and increased the amount of discretion a trial court may exercise. Bise holds that "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." 380 S.W.3d at 706 (emphasis added). There is "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707 (emphasis added). We agree with the Defendants that the presumption of reasonableness refers to determinations made by the trial court, and here, the trial court improperly relied on the jury's determinations. In accordance with Bise, and the broad discretion now afforded a trial court's, not a jury's, sentencing decision, we think the appropriate remedy in this situation is a remand to the trial court for resentencing.[9] To hold otherwise, would permit the trial judge to delegate his decision-making authority when such is not authorized by statute or case law. See, e.g., State v. Charles Hopson Stewart, No. M2008-00474-CCA-R3-CD, 2008 WL 44671790, at *4 (Tenn. Crim. App. Oct. 6, 2008) (holding that the "trial judge violated the defendant's due process protections in allowing the drug court team to deliberate and make a recommendation to the court about the disposition of a matter that was statutorily vested in the trial judge's authority").

---

[9] During sentencing, the trial court indicated that the aggravated assault and attempted murder convictions "should be considered as one offense" because "[i]t was a continuing course of conduct for the same victim." If this ruling was meant to denote merger of the convictions, then such should be properly reflected on the judgment forms on remand following resentencing.

We note that this is not a case involving "safeguarding the jury guarantee" because our Sentencing Act requires judges to impose sentences upon criminal defendants, not juries. Our Sentencing Act has been approved as sound; thus, this case does not involve, strictly speaking, a Sixth Amendment issue. See Cross, 362 S.W.3d at 528-29. Nonetheless, the instructional error in this case strikes at the very heart of our sentencing procedures and to employ harmless error analysis requires us to engage in speculation. See Sullivan v. Louisiana, 508 U.S. 275, 281 (1993). This type of fundamental procedural error affects the framework within which the sentencing hearing proceeds. See Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991) (discussing "structural" errors, including those that "defy analysis by 'harmless-error' standards" by affecting entire adjudicatory framework). The sentencing procedure employed here amounts to an improper application of the Sentencing Act, and we will not allow that error to be compounded by deeming it harmless. See., e.g., United States v. Gibbs, 578 F.3d 694, 695-96 (7th Cir. 2009) (remanding for resentencing where district court committed procedural error by failing to calculate advisory guideline range for supervised release term).

## CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the Defendants' convictions. However, we remand the case for a new sentencing hearing as provided for in this opinion.

_____
D. KELLY THOMAS, JR., JUDGE